2008 OK CR 26

**Brian Thomas LOWERY, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. F–2007–471.

Court of Criminal Appeals of Oklahoma.

Sept. 5, 2008.

Paula J. Alfred, Assistant Public Defender, Tulsa, Oklahoma, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Diane L. Slayton, Assistant Attorney General, Oklahoma City, Oklahoma, attorneys for appellee on appeal.

## OPINION

CHAPEL, Judge.

¶1 Brian Thomas Lowery was tried by jury and convicted of Indecent Exposure, under 21 O.S.Supp.2003, § 1021 (Counts I, II, III, VII, and IX); First–Degree Burglary, under 21 O.S.2001, § 1431 (Count IV); Lewd Molestation, under 21 O.S.Supp.2003, § 1123 (Count VI); and Assault and Battery (misdemeanor), under 21 O.S.Supp.2005, § 644 (Count X), in Tulsa County District Court, Case No. CF–2005–4425.[1] In accordance with the jury's recommendation, the Honorable Dana L. Kuehn sentenced Lowery to imprisonment for five (5) years and a $500 fine on Count I; imprisonment for four (4) years and a $500 fine on Count II; imprisonment for four (4) years and a $500 fine on Count III; imprisonment for twenty (20) years and a $500 fine on Count IV; imprisonment for thirty (30) years and a $500 fine on Count VI; imprisonment for ten (10) years and a $500 fine on Count VII; imprisonment for seven (7) years and a $500 fine on Count IX; and ninety (90) days in the county jail and a $100 fine on Count X.[2] The Honorable Dana L. Kuehn ordered that Counts I, II, III, IV, VI, VII and IX all be served consecutively with each other, but concurrently with Count X. Lowery appeals his convictions and his sentences.

### Facts

¶2 This case involves a string of lewd incidents on the night of September 29, 2005, in the southern section of Tulsa, Oklahoma. At approximately 6:30 p.m. that evening, M.S. was walking to the laundry room of her

Marny Hill, Assistant Public Defender, Tulsa, OK, attorney for defendant at trial.

Jack Thorp, Assistant District Attorney, Tulsa, OK, attorney for the State at trial.

1. The victims of Lowery's string of offenses, all committed on September 29, 2005, were as follows: M.S. in Count I, M.L. in Count II, D.B. in Count III, L.A. in Counts IV, IX, and X, and N.B. in Counts VI and VII. Counts V and VIII were dismissed prior to Lowery's trial.

2. Lowery was also ordered to pay victim's compensation assessments of $125 on Counts I and VI, and $50 on Counts II, III, IV, VII, IX, and X, as well as other court costs and fees.

apartment complex to do her laundry. A white man with black hair, wearing only a black t-shirt, black shoes, and black socks, followed her into the laundry room. As she was putting laundry in the dryer, the man yelled "Hey, Hey," and when M.S. turned around, he lifted up his shirt. He wasn't wearing anything underneath and started masturbating in front of her. M.S. ran past the man out of the laundry room, telling him that she was going to call the police, and he ran off. M.S. identified Brian Thomas Lowery at trial as the man who had exposed himself to her, testifying that she was "absolutely sure" it was him.

¶ 3 At approximately 7:00 p.m. that same evening, M.L. arrived at the JCPenney's parking lot at the Woodland Hills Mall. As she got out of her car and began walking toward the store, she saw a man walking toward her who was flashing his penis at her.[3] The man was wearing only a black t-shirt, with black shoes and black socks, and he exposed himself to her multiple times by raising up his shirt. M.L. rushed into the store and asked for security. When she came back outside with a loss prevention officer, she spotted the same man still in the parking lot, and the officer chased him until he lost sight of him. M.L. identified Lowery at trial as the man who had had exposed himself to her and testified that she had "no doubt whatsoever" that it was him. The JCPenney's loss prevention officer also identified Lowery as the man in the black shirt that he had chased through the parking lot.

¶ 4 At approximately 8:00 p.m. that same evening, D.B. was walking from her apartment to her car when a man, wearing only a long black t-shirt, started walking behind her and seemed to be following her. She turned, confronted him, and asked where he was from, to which he responded, "Over there." D.B. said, "I don't think so," and began praying out loud. The man then ran a short distance away, but then stopped, raised his

shirt, and started playing with his penis. D.B. yelled that she was going to call the police, but the man continued playing with himself, in plain view, until she ran inside her apartment. When she came back out, he was gone. D.B. identified Lowery at trial as the man who had exposed himself to her and testified that she had no doubt that it was him.[4]

¶ 5 L.A. testified that she was alone in her South Tulsa apartment that same evening. At approximately 8:45 p.m., she left the apartment to take out her trash. Although she locked her front door when she returned, her back sliding glass door was open, and her sliding screen door was closed but not locked. When she returned she lay down on her couch and was watching television. At approximately 9:00 p.m., someone came up behind her and put his hand over her mouth. When she turned to see who it was (thinking it might be her boyfriend), she saw a man whom she did not recognize, who was not wearing any clothing. She pulled his hand off her mouth and tried to get up. The man pushed her back down, into her coffee table, and ran out the back sliding door.[5] L.A. testified that she got a clear view of the man's face, that the man was not clean shaven, and that as he ran away, she noticed that he was carrying something that looked like a black or navy shirt. L.A. later noticed that approximately $150 in cash was missing from her kitchen counter. L.A. identified Lowery at trial as the man who came into her apartment and noted that she did not have any doubt that it was him.

¶ 6 At approximately 9:25 p.m. that night, N.B., who was fourteen years old at the time, was talking on a pay phone within the apartment complex in which she lived. She turned around when she felt something touch her butt.[6] She initially assumed it was a friend and turned around saying, "What the F?" She then saw that the person who

---

3. M.L. testified that the man had black hair and a goatee.

4. When challenged about her identification at trial, D.B. testified, referring to Lowery, and said, "[T]hat's the same person and that's—I know that I know that I know that I know."

5. L.A. testified that she ran out through her front door, which she had to unlock.

6. At trial D.B. testified that she felt hands touch her bottom; at the preliminary hearing she testified that it was the face of the man (who was kneeling behind her) that touched her.

touched her was not a friend, but instead was a naked man crouching down behind her. She then said, "No, seriously, what the F?" And the man covered his face with his hands, stood up, and immediately ran away. N.B. noted that the man was holding something in his hand that looked like a dark-colored shirt. N.B. identified Lowery at trial as the man who came up behind her and touched her that night.

¶ 7 Detective Rod Russo was the lead detective for the series of incidents that occurred on September 29, 2005. He testified that a Woodland Hills Mall security officer provided him with a license tag number of a possible suspect. Russo was able to track the vehicle to Lowery's girlfriend at the time. Russo then prepared a six-person photographic lineup, from which each of the victims of September 29, 2005, picked out Lowery's picture.[7] When Russo went to the girlfriend's home, Lowery answered the door—wearing a black t-shirt—and was arrested.

### Analysis

¶ 8 In Proposition I, Lowery strenuously challenges the trial court's decision to admit evidence into his trial regarding a separate and serious sexual assault on a child, maintaining that this was improper "other crimes" evidence. Lowery asserts that evidence about the rape by instrumentation of fifteen-year-old R.P., which occurred two months earlier, was irrelevant to the charges against him, was not admissible under any of the exceptions to the prohibition of such "other

crimes" evidence, was unnecessary, and was far more prejudicial than probative.[8] The State filed a *Burks* notice prior to Lowery's trial, noting its intent to present this evidence, and a full hearing was held regarding the admissibility of this evidence during the trial.[9] At the conclusion of the hearing, the trial court ruled that it would allow this "other crimes" evidence, finding that it was admissible on the issues of "identity" and "motive." [10]

¶ 9 This Court has recently reviewed the rules for the admission of other crimes evidence and summarized these rules as follows:

Other crimes evidence is not admissible to show that a person is acting in conformity with a character trait. Evidence of a prior bad act may be admissible if it is offered for a purpose specifically identified in § 2404(B). The following factors are necessary for the use of other crimes evidence. There must be a visible connection between the other crimes evidence and the charged crimes. The evidence must go to a disputed issue and be necessary to support the State's burden of proof, and its probative value must outweigh the danger of unfair prejudice. It must be established by clear and convincing evidence. The jury must be properly instructed on the limited purpose for which the evidence may be considered. If the evidence is offered to show a common scheme or plan, it must embrace the commission of crimes so related to each other that proof of one tends to establish the other.[11]

---

7. Each of the victims who testified at trial noted that she had earlier identified Lowery's picture in a photo lineup. And each of these photographic lineups was admitted into evidence at trial, with a date of the identification, the initials of each victim, and some kind of indication that Lowery was the one. For example, M.L. had circled Lowery's picture and wrote, "I know this is him." L.A. testified that she was surprised how easy it was to pick Lowery out of the lineup.

8. Lowery had already been charged with this crime in a separate case, CF–2005–4661.

9. *See generally Burks v. State,* 1979 OK CR 10, 594 P.2d 771, *overruled in part on other grounds, Jones v. State,* 1989 OK CR 7, 772 P.2d 922. The hearing was held during the jury selection process, without the jury present.

10. *See* 12 O.S.2001, § 2404(B) ("Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.").

11. *James v. State,* 2007 OK CR 1, ¶ 3, 152 P.3d 255, 256–57 (footnotes, containing citation to other authorities, omitted); *see also Burks,* 1979 OK CR 10, ¶¶ 2–18, 594 P.2d at 772–75; *Lott v. State,* 2004 OK CR 27, ¶¶ 40–42, 98 P.3d 318, 334–35. The *James* case is also noteworthy because it abolished the "greater latitude rule," which allowed the admission of certain otherwise-inadmissible "other crimes" evidence in

We evaluate the R.P. evidence in the current case under these requirements.[12] This Court notes that although defense counsel vigorously challenged this other crimes evidence during the in-trial hearing on its admissibility, counsel failed to renew his objection to this evidence at the time it was actually offered at trial. Hence this Court reviews only for plain error.[13]

¶ 10 The challenged "other crimes" evidence in the current case came in through the testimony of two witnesses: R.P. (the victim in the other case) and Liz Eagan (the investigator in the other case).[14] R.P. was the final witness in Lowery's trial. She testified that on July 29, 2005, when she was fifteen years old, she spent the night in her grandmother's Tulsa apartment. She testified that her grandmother went to sleep around 10:30 p.m. and that she was sure that the one door into the apartment was locked at that time.[15]

R.P. testified that she stayed up until approximately 3:00 a.m., on the morning of July 30, 2005, watching television and doing a project for her grandmother's vacation bible school class. She then fell asleep on the living room couch. R.P. woke up around 6:00 a.m., when she felt pressure between her legs and felt someone's fingers inside of her.[16] She testified that she could feel fingernails and that they were long. As R.P. woke up, she saw a man kneeling next to her. She testified that he was wearing a white t-shirt and jeans shorts and that he had long dark hair and was not clean-shaven.

¶ 11 R.P. testified that she started screaming and moving and that the man then jumped up and tried to hold down her arms. When she continued screaming, the man grabbed her blanket, threw it over her face, and ran out the front door. R.P. then ran into her grandmother's room, and they called

cases involving sexual assaults. 2007 OK CR 1, ¶ 4, 152 P.3d at 257 (overruling *Myers v. State*, 2000 OK CR 25, 17 P.3d 1021, to the extent that it created "greater latitude rule").

**12.** In his separate opinion, concurring in part and dissenting in part, Judge Lumpkin suggests that today's Court opinion "misstates the law, conflicts with existing case law, and creates confusion in our jurisprudence." Judge Lumpkin lays out the standard for determining the admissibility of other crimes evidence by quoting from *Eizember v. State*, 2007 OK CR 29, ¶ 76, 164 P.3d 208, 230, and emphasizes the phrase from *Eizember* that other crimes evidence "must be probative of a disputed issue of the crime charged." Yet today's Court opinion does not conflict with or alter the standard articulated in *Eizember* (or in any of the other cases cited by Judge Lumpkin). In fact, Judge Lumpkin also cites with approval our recent decision in *James* (quoted *supra*) and notes, "We have also phrased [the other-crimes-evidence admissibility standard] as '[t]he evidence must go to a disputed issue and be necessary to support the State's burden of proof' " (emphasis added by Lumpkin, quoting *James*, 2007 OK CR 1, ¶ 3, 152 P.3d at 256–57). Saying that other crimes evidence "must be probative of a disputed issue of the crime charged" and that this evidence "must go to a disputed issue" are simply two different ways of articulating the same standard. Furthermore, both of the quoted standards clearly state that the proffered other crimes evidence must "be necessary to support the State's burden of proof." Judge Lumpkin later complains that whether or not the State will "need" the other crimes evidence to prove its case is "a fact not known at the time of

trial when the trial judge is making a decision on the admissibility of evidence." Hence Judge Lumpkin is effectively arguing that the trial court should not be expected to evaluate the "necessity" of the proffered other crimes evidence; and he would prefer to eliminate this requirement of our current law. As explained further herein, it is not too much to ask the trial court to examine the basic elements of the crime(s) at issue and the State's expected evidence, in order to determine whether the other crimes evidence at issue can indeed be expected to fill a particular and authorized purpose or "need" within the State's case—either an element of an offense or one of the authorized purposes of § 2404(B)—rather than being gratuitous and improper character evidence. Today's opinion does not misstate, conflict with, or confuse existing law, but the approach of Judge Lumpkin would.

**13.** This Court will not, however, ignore the fact that the trial court was well aware that Lowery had challenged the admission of this evidence, as well as his reasons for challenging it.

**14.** R.P.'s testimony comprised 34 transcript pages, and Eagan's testimony comprised 32 pages-making the evidence regarding this incident much longer, in terms of transcript pages, than the evidence regarding any of the five incidents for which Lowery was actually being tried.

**15.** R.P. noted that she checked that the front door was locked before she went to sleep.

**16.** R.P. noted that the pants she had worn to bed had been taken off of her.

the police.[17] R.P. identified Lowery at trial as the man who had "sexually touched" her and testified that she had earlier identified Lowery's picture in a photographic lineup.[18] R.P. also testified that she was "100 percent positive" that Lowery was the man who assaulted her.[19]

¶ 12 Detective Liz Eagan, of the Tulsa Police Department, was the lead detective in the R.P. case. She testified that there were "similarities" between the R.P. case and a separate case being investigated by Detective Rod Russo, i.e., the L.A. case. The similarities noted by Eagan were that both victims were lying on a sofa in an apartment, when a man with a mustache and a goatee came in and assaulted them.[20] Eagan noted that R.P. had stated that she could feel the fingernails of the man who sexually assaulted her and that Russo told her that Lowery had very long fingernails.[21]

■ ¶ 13 The trial court allowed the R.P. "other crimes" evidence into the trial of the current case based upon its findings that this evidence was admissible on the issues of "identity" and "motive," particularly in regard to the L.A. incident.[22] On appeal, the State argues that the R.P. evidence was admissible under two somewhat different exceptions to the rule against such evidence: (1) common scheme or plan and (2) absence of mistake or accident. The trial court rejected the State's "absence of mistake" argument at the Burks hearing in this case, noting that there was no suggestion that Lowery's defense at trial would be that somehow his encounters with these five women (or any one of them) were "accidental" or simply misunderstandings. This Court likewise concludes that there is no suggestion in the record that Lowery ever did or would claim that any kind of "mistake" or "accident" was the basis for the

---

17. R.P. testified that the doors of the hallway to her grandmother's room had been closed, even though they were open when she fell asleep.

18. R.P. identified Lowery in the same photographic lineup that was used in connection with the series of incidents on September 29, 2005, and this lineup was likewise admitted at trial.

19. R.P.'s trial testimony was somewhat different than her preliminary hearing testimony. A joint preliminary hearing was held on November 30, 2005, which covered the current case as well as two other cases in which Lowery was charged: CF–2005–4661 (involving R.P.) and CF–2005–4662 (involving two incidents that occurred on September 13, 2005). At the preliminary hearing R.P. testified that the room was dark, that she couldn't see the perpetrator's face (except his eyes), that she didn't remember what he was wearing (or if he was wearing anything), that she couldn't tell how tall or how heavy he was, and that she couldn't even tell whether he was black, white, Spanish, or Chinese. She testified that she was "not positively sure" that it was fingers inside her, but that she thought it was fingers, because she could "feel fingernails." She did not, however, describe the fingernails as "long" or in any way unusual. And although she identified Lowery as her attacker at the preliminary hearing, she also testified that before the hearing someone had told her that the person who assaulted her would be in the courtroom and that he would be wearing an orange suit. Although R.P. was cross-examined at trial about her ability to see her attacker and her description of him, she was not cross-examined about the aspects of her preliminary hearing testimony noted herein. This Court notes that the other two cases in

which Lowery had been charged were dismissed in October of 2007, at the State's request, after he was convicted and sentenced in the current case.

20. Eagan did not mention an additional similarity that was argued by the State at trial and again on appeal: the fact that a theft was alleged in both cases. L.A. testified that $150 in cash was taken from her kitchen counter, and the State had alleged in the R.P. case that her grandmother's purse was stolen from a dining room chair. When R.P. was asked about the purse during Lowery's trial, however, she testified that she did not know whether or not her grandmother ever found her purse.

21. A photograph of Lowery's fingernails, taken on the day he was arrested, was admitted into evidence at trial, over defense objection. Not only are his fingernails quite long in the photograph; they are very well-manicured (like a woman's). However, none of the victims of the September 29, 2005, string of incidents testified to noticing anything unusual about Lowery's fingernails.

22. The State had argued these two exceptions to the rule against other crimes evidence, as well as the "absence of mistake" exception. See 12 O.S. 2001, § 2404(B). This Court notes that prior to the testimony of both R.P. and Eagan and again during the jury's final instructions, the trial court instructed the jury (in accord with Burks ) that the R.P./Eagan testimony should be considered "solely on the issue of the defendant's alleged motive and identity."

crimes alleged against him. Hence the R.P. evidence cannot possibly have been justifiable on this basis.

¶ 14 This Court recognizes that the "identity" and the "common scheme" or "plan" exceptions under § 2404(B) are sometimes related and overlapping, since a particularly unique or distinctive common plan/scheme can be quite probative in revealing the identity of a particular perpetrator. For example, in *Lott v. State*,[23] this Court recognized that the similarities among the rape/homicides of two elderly women and the rapes of two other elderly women were so significant and striking that they pointed to the "signature" involvement of a particular perpetrator in all four cases.[24] We concluded that the common elements of the four cases showed "a visible connection sufficient to characterize a common scheme and to be probative on the issue of [the] identity of the perpetrator."[25] The question is whether the similarities between the R.P. attack and the L.A. attack (or any of the other incidents in the current case) are significant enough to qualify for either the "identity" or "common plan" exceptions under § 2404(B).

■■■ ¶ 15 We begin by noting that the R.P. evidence did not resolve any disputed issue in the current case, nor was it necessary for the State's burden of proof in this case.[26] Regarding the issue of the defendant's "identity," each of the five victims from the September 29 series of incidents was very certain about her identification of Lowery. The physical descriptions provided by the victims were similar and reasonably accurate, and all referred to a black or dark-colored t-shirt, but no pants, shorts, or underwear. The first three victims described the defendant as wearing only a black t-shirt, which he raised to expose himself, while the last two victims described him as being completely naked and carrying what appeared to be a black or dark-colored t-shirt. Hence the identifications of Lowery by these five witnesses were quite strong and were also mutually supportive of each other.[27]

¶ 16 Hence no further "identity" evidence was needed in the current case, and the R.P. evidence was not even particularly helpful in this regard. The description of her attacker provided by R.P. was quite different than that of the September 29 victims, since R.P. described him as wearing a white shirt and, more significantly, something on his bottom half, *i.e.,* a pair of jean shorts. R.P.'s attacker was fully clothed, but had removed her pants while she slept, and the crime occurred early in the morning. The perpetrator in the September 29 incidents was either wearing only a t-shirt or completely naked, approached women who were awake, during the evening, and did not attempt to remove anyone's clothing.[28]

**23.** 2004 OK CR 27, 98 P.3d 318.

**24.** *See id.* at ¶¶ 43–44, 98 P.3d at 335 (summarizing similarities among the four cases, including the age of the white female victims, that they all lived alone and within three miles of each other, how and when their homes were broken into, that all four were raped in their own bedrooms, the time at which the attacks occurred, the type of beatings, abuse, and injuries that all four victims endured, the proximity of the victims' homes to where the defendant was living at the time, *etc.*).

**25.** *Id.* at ¶ 43, 98 P.3d at 335; *see also id.* at ¶ 42, 98 P.3d at 335 ("This Court has allowed evidence of other crimes or bad acts to be admitted under the 'plan' exception of § 2404(B) where the methods of operation were so distinctive as to demonstrate a visible connection between the crimes. Distinctive methods of operation are also relevant to prove the identity of the perpetrator of the crime.") (all citations omitted).

**26.** In other words, the R.P. other crimes evidence was not "probative" on the issue of the perpetrator's identity in the current case, nor did it truly "go to" this issue. And it certainly was not "necessary" to support the State's burden of proof in the current case.

**27.** The State emphasizes the strength of the victims' identifications of Lowery in its brief, arguing that they "secured the verdict in this case" and that the "evidence of guilt was overwhelming, even without the other crimes evidence." The State apparently fails to recognize that the lack of *need* for this evidence in the current case is one of the reasons that it should have been excluded.

**28.** Judge Lumpkin complains that this Court's analysis is an improper " 'after the fact' determination that the State did not need the other crimes evidence to prove its case" and that this Court is basing its analysis on facts that are "not known at the time of trial." Although none of the players in the criminal jury trial system can

¶ 17 Furthermore, the crimes of September 29, 2005, appear to be crimes of opportunity, unlike the crime against R.P., which involved breaking into a locked apartment, over seven hours after the doors had been locked and three hours after the lights had been turned off. In addition, five of the six incidents on the night of September 29 occurred in public or semi-public places, mostly somewhere within the apartment complex of each victim. Although the L.A. assault (like the R.P. assault) occurred within an actual apartment, it occurred within approximately 15 minutes of L.A. leaving and then returning to her apartment-when she was likely observed by the perpetrator, who was then able to follow her into her apartment through an unlocked sliding door. The assault on R.P. does have some generic similarities to the L.A. assault, since both L.A. and R.P. were laying down on an apartment couch at the time they were confronted by their attacker, who entered the apartment secretly and without permission.[29] Yet this degree of commonality does not come close to establishing the kind of *"modus operandi"* that qualifies as a signature common scheme/plan; nor is it so unique that it significantly aids in identifying a perpetrator.[30] The "visible con-

be expected to know or perfectly predict how a particular trial will evolve, the established *Burks* standards do require that the State justify and that the trial court confirm that the proffered other crimes evidence can be expected to fulfill an authorized role within the State's overall case. And in the current case, this would not have been particularly difficult. The trial court was informed, through the State's *Burks* notice and argument, regarding the type of evidence R.P. would present. The trial court was also informed that R.P. had testified at the preliminary hearing in this case; hence the trial court could have reviewed this actual testimony (along with that of the victim witnesses) if it felt that such a review was necessary for or would be helpful to making its admissibility decision. Furthermore, the State argued, even before any evidence was presented at trial, that the "positive identifications" of the defendant from all of the victims in the current case "have been unwavering from preliminary hearing and I expect to be unwavering here with this court." And by the time R.P. was actually put on the witness stand, the trial court had actually heard every one of these same victims positively identify Lowery as the person responsible for the crime(s) against them. Yet the trial court repeatedly stated that the "identity" issue was the main reason it was allowing in the R.P. testimony. This Court does not fault the trial court's inability to perfectly "speculate" about what evidence the State might or might not need. This Court faults the trial court's failure to properly *evaluate* the *Burks* issue that was before it in this case. In other words, if the State has particularly strong evidence that identifies the defendant as the perpetrator in a particular case—as the State had in the current case—allowing in other crimes evidence on the issue of "identity" is a particularly weak and questionable basis for allowing in such potentially prejudicial evidence.

29. It is also unclear whether the perpetrator in the R.P. case could have known that R.P. would have been asleep on a couch, since she testified that all the blinds were closed and that you could not see into the apartment. This fact appears more like a coincidence than part of a perpetrator's specific scheme or plan. And the fact that both entries may also have involved the theft of a convenient target, cash or a purse left in plain view, likewise does not appear particularly significant (and was not emphasized by the State at trial).

30. *Cf. Bryan v. State*, 1997 OK CR 15, ¶¶ 2–4, ¶¶ 31–34, 935 P.2d 338, 346–47, 356–57 (finding that evidence regarding defendant's prior conviction for solicitation of murder was admissible other crimes evidence in case charging first-degree murder, where both cases involved plan by defendant to kidnap a victim with whom defendant had some prior dealings, bring victim to property owned by defendant's parents, force victim to sign promissory notes for defendant's benefit, kill victim, and then present the notes to victim's estate for payment); *Driskell v. State*, 1983 OK CR 22, ¶¶ 26–28, 659 P.2d 343, 350 (per curiam) (finding that evidence regarding prior kidnapping was admissible in kidnapping/murder case where similarities between the crimes—both involving boys of similar age being abducted from same area, after an evening baseball game, who were tied in an unusual manner, driven to a rural area, and abandoned alongside a rural road, *etc.*—were adequate to establish a "common scheme"); *LaFayette v. State*, 1985 OK CR 5, ¶ 11, 694 P.2d 530, 531 (finding that "close proximity in time (three attacks within a two day period), the manner of the acts [*i.e.*, the same act], and the fact that all three acts involved the same victim constitutes a visible connection sufficient to allow the evidence under *Burks* "). The limited "visible connection" between the L.A. and R.P. crimes is more akin to other cases in which this Court has concluded that other crimes evidence was improperly admitted. *See, e.g., Blakely v. State*, 1992 OK CR 70, ¶ 12, 841 P.2d 1156, 1159 ("[T]here are no facts linking the two crimes beyond the fact that in each case the appellant was apprehended near a baggie containing crack cocaine."); *Wells v. State*, 1990 OK CR 72, ¶¶ 2–8, 799 P.2d 1128, 1129–30 (finding that evidence that defendant allegedly committed

nection" between the L.A. case and the R.P. case is simply not that substantial.[31]

¶ 18 In fact, to the extent that Lowery's identity as the perpetrator of the crimes charged in the current case was even in doubt, the evidence regarding the separate attack on R.P.—which was more different from than it was similar to the September 29 incidents—did nothing to strengthen the State's case that Lowery was the perpetrator of the series of crimes in the current case. Although the State emphasized the significance of R.P.'s fingernail testimony at trial, none of the victims in the current case even mentioned or noticed Lowery's fingernails. Hence the admission of the photograph of Lowery's uniquely long fingernails was totally irrelevant to the crimes on trial. Yet this photo (which was objected to) did make it appear more likely that Lowery was indeed the perpetrator of the R.P. sexual assault—thereby increasing the potential prejudice from this improperly admitted other crimes evidence.[32]

¶ 19 Finally, this Court notes that the R.P. evidence was not admissible under the "motive" exception to such evidence (as found by the trial court) and that the State's arguments at trial in this regard were what made this evidence particularly prejudicial and improper in the current case. Although R.P., the State's final witness, described what she had endured as being "sexually touched," the prosecutor repeatedly described this same sexual assault (*i.e.,* "rape

by instrumentation" under Oklahoma law) using the substantially more inflammatory term "rape"—two times in his final questioning of R.P. and at least ten times during his closing arguments.[33] At one point the prosecutor made quite clear that the real purpose of the R.P. evidence was to show what would have happened to L.A. if she had not been awake to fight Lowery off:

> And that's the whole purpose that [R.P.] had to get here, because [L.A.] and [R.P.] have almost the same story, apartments, asleep on the couch, burglaries. [L.A.] wasn't asleep and she was able to fight him off, but [R.P.] slept hard and she was raped and she identified this defendant.

This argument, which was made less directly as well, maximized the potentially prejudicial impact of the improperly admitted R.P. evidence.

¶ 20 Without the R.P. evidence, the L.A. assault appears to be essentially one among a series of five lewd encounters on the evening of September 29, 2005, in which the defendant approached an unsuspecting female victim and exposed himself to her (or was already naked), twice actually touching the victim for perhaps a few seconds, but then fled the scene when he encountered any substantial resistance or the victim sought assistance. Although each of these encounters was certainly highly disturbing and even frightening for the victims—and L.A.'s encounter probably most of all—none seem quite as invasive or as sinister and serious as the R.P. sexual assault. Yet by allowing the

---

various other (uncharged) sexual crimes against three other child relatives, up to 9 years earlier, was "too tenuous" a connection for such evidence to be admissible in case charging lewd molestation of defendant's daughter).

**31.** Judge Lumpkin cites this Court's recent decision in *Williams v. State,* 2008 OK CR 19, ¶ 44, 188 P.3d 208, 220, and argues that the Court's analysis herein is "inconsistent with *Williams.*" The portion of *Williams* quoted by Judge Lumpkin includes the following statement: "Where there are enough similarities between the two crimes to support the trial court's decision, then we must give deference to the trial court's decision." *Id.* The analysis herein is entirely consistent with *Williams.* We do not simply defer to the trial court's decision in this case, because there are *not* enough similarities between the crimes at issue to support that decision.

**32.** *See Blakely,* 1992 OK CR 70, ¶ 12, 841 P.2d at 1159 (noting that when other crimes evidence with "minimal relevancy" is sought to be used at a trial, it "raises the very real possibility that the evidence is not really offered for a proper purpose," but rather for the improper purpose of suggesting that the defendant's "true character" was revealed in the prior crime and is likewise exemplified in the crime at issue); *Lott,* 2004 OK CR 27, ¶ 41, 98 P.3d at 335 (other crimes evidence should not be admitted "where its minimal relevancy suggests the possibility the evidence is being offered to show a defendant is acting in conformity with his true character").

**33.** The prosecutor invoked the term "rape" almost every time R.P. was mentioned during his closing arguments, once referring to Lowery as the "suspect who raped a little girl."

jury to learn the details of the R.P. assault, which was neither charged in nor relevant to the current case, the State was able to cast an even more sinister and serious light upon the crimes that were at issue, particularly the L.A. and N.B. crimes, where Lowery had actual physical contact with the victims.

■ ¶ 21 We conclude that the R.P. other crimes evidence was not admissible under any of the exceptions to the rule against other crimes evidence and that the trial court committed plain error in admitting this evidence. We agree with the State that the evidence of Lowery's guilt on each of the charged crimes was overwhelming and that there is no reasonable probability that the improper admission of the R.P. evidence had any impact on Lowery's convictions. Hence the admission of this evidence was harmless error in regard to Lowery's convictions.

■ ¶ 22 This Court cannot conclude, however, that the wrongful admission of this very prejudicial evidence was harmless in regard to the sentences Lowery received. This Court finds that the admission of this other crimes evidence likely had a significant effect upon the sentences received by Lowery, particularly the sentences on the counts involving the crimes against L.A. and N.B., as well as the way these sentences were ordered to be carried out.

¶ 23 Accordingly, this Court finds that Lowery's sentence should be modified as follows. Lowery's Count IV sentence for First–Degree Burglary should be modified from imprisonment for twenty (20) years to imprisonment for fifteen (15) years, and his Count VI sentence for Lewd Molestation should be modified from imprisonment for thirty (30) years to imprisonment for twenty-five (25) years. In addition, all of the counts should be run concurrently, rather than consecutively.

■ ¶ 24 In Proposition II, Lowery argues that the State committed prosecutorial misconduct in its closing arguments by disparaging the role of defense counsel and repeatedly referring to "defense tactics" in a way that demeaned the role of defense counsel within the criminal justice system.[34] This Court finds that some of the prosecutor's arguments were invited by defense counsel and that although some of the remarks were arguably improper, they certainly did not render Lowery's trial unfair. This Court concludes that the challenged arguments did not have any impact on Lowery's convictions and that any potential prejudice regarding his sentences has already been addressed by the sentencing modifications in this case. This claim is rejected accordingly.

### Decision

¶ 25 All of Lowery's convictions are hereby **AFFIRMED.** His sentences on Counts I, II, III, VII, IX, and X are likewise **AFFIRMED.** Lowery's sentence on **COUNT IV,** First–Degree Burglary, is hereby **MODIFIED** to imprisonment for fifteen (15) years, and his sentence on **COUNT VI,** Lewd Molestation, is likewise **MODIFIED** to imprisonment for twenty-five (25) years.[35] In addition, this Court orders that all of the counts of Lowery's sentence be served **CONCURRENTLY.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2008), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, V.P.J. and A. JOHNSON, J.: concur.

LEWIS, J. concur in result.

LUMPKIN, P.J. concur in part/dissent in part.

LUMPKIN, Presiding Judge: concur in part/dissent in part.

¶ 1 I concur in affirming the convictions in this case. However, I must dissent to the modification of the sentences. The Court's decision misstates the law, conflicts with existing case law, and creates confusion in our jurisprudence rather than clarifying it.[1] This

---

**34.** Lowery did not object to any of the challenged arguments at trial.

**35.** The other elements of the sentences on Counts IV and VI shall remain the same.

**1.** My colleague's extensive footnotes seeking to

is most apparent in the Court's conclusion that the R.P. evidence "did not resolve any disputed issue in the current case" and was not necessary for the State's burden of proof. This is not the standard of review for the admissibility of other crimes evidence. This Court has repeatedly held:

> To be admissible, evidence of uncharged offenses or bad acts *must be probative of a disputed issue of the crime charged,* there must be a visible connection between the crimes, evidence of the other crime(s) must be necessary to support the State's burden of proof, proof of the other crime(s) must be clear and convincing, the probative value of the evidence must outweigh the prejudice to the accused and the trial court must issue contemporaneous and final limiting instructions. (emphasis added)

*Eizember v. State,* 2007 OK CR 29, ¶ 76, 164 P.3d 208, 230; *Lott v. State,* 2004 OK CR 27, ¶ 40, 98 P.3d 318, 334–335; *Welch v. State,* 2000 OK CR 8, ¶ 8, 2 P.3d 356, 365; *Bryan v. State,* 1997 OK CR 15, ¶ 33, 935 P.2d 338, 356 citing to *Burks v. State,* 1979 OK CR 10, 594 P.2d 771, *overruled in part on other grounds, Jones v. State,* 1989 OK CR 7, 772 P.2d 922. We have also phrased it as "[t]he *evidence must go to a disputed issue* and be necessary to support the State's burden of proof." *James v. State,* 2007 OK CR 1, ¶ 3, 152 P.3d 255, 256–57 (emphasis added).

¶ 2 Further, with the benefit of hindsight, the Court makes an "after the fact" determination that the State did not need the other crimes evidence to prove its case. However, that is a fact not known at the time of trial when the trial judge is making a decision on the admissibility of evidence. Of what relevance is the Court's statement that the "crimes of September 29, 2005, appear to be crimes of opportunity, unlike the crime against [R.P.], which involved breaking into a locked apartment, over seven hours after the doors had been locked and three hours after the lights had been turned off"? This is pure supposition and conjecture which has nothing to do with applying the Rule of Law established by this Court. In fact, this type of speculation is in conflict with our recent decision in *Williams v. State,* 2008 OK CR 19, ¶ 44, 188 P.3d 208 wherein we said:

> This Court should not be in the business of weighing the similarities against the dissimilarities. When there are enough similarities between the two crimes to support the trial court's decision, then we must give deference to the trial court's decision. Once that threshold is met, any differences in the two crimes go to the weight of the evidence and not to the admissibility.

¶ 3 Judge Lewis's language was very clear in *Williams.* The Court's analysis in this case is inconsistent with *Williams* and merely creates confusion as to what is required of trial judges in determining whether § 2404(B) evidence is admissible at trial. Is the trial judge to look at the motives of the State rather than the objective evidence presented? Is the trial judge supposed to divine the effect the evidence would have on the jury and whether the jury would find sufficient evidence to convict without the other crimes evidence? Hopefully not, because that is not the role of the trial judge and it has nothing to do with objectively determining the admissibility of evidence.

¶ 4 The trial court in this case made a factual finding prior to admitting the § 2404(B) evidence, that finding is supported by the record and not clearly erroneous. That is the end of the analysis. *See Stouffer v. State,* 2006 OK CR 46, ¶ 60, 147 P.3d 245, 263 where we said:

> The admission of this evidence, as with all evidence, is reviewed under an abuse of discretion standard. The introduction of evidence is left to the sound discretion of the trial court; the decision will not be disturbed absent an abuse of that discretion. *Pickens v. State,* 2001 OK CR 3, ¶ 21, 19 P.3d 866, 876. An abuse of discretion is "a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented." *C.L.F. v. State,* 1999 OK CR 12, ¶ 5, 989 P.2d 945, 946.

¶ 5 Speculation by an appellate court as to whether the evidence was needed due to the

---

justify the deviation I have noted seems to fit William Shakespeare's great line from Hamlet, Act III, Scene II, "The [gentleman] protests too much, methinks".

fact the State had a strong case is not an appropriate part of appellate review. Appellate jurisdiction is that power and jurisdiction to review and correct those proceedings of inferior courts brought for determination in the manner provided by law. *Carder v. Court of Criminal Appeals*, 1978 OK 130, ¶ 12, 595 P.2d 416, 419. As a result of this appellate jurisdiction, this Court is tasked with the responsibility of reviewing actions in the District Court to determine if the facts developed therein support the District Court's decision under the law, not inserting our own personal views of the evidence.

¶ 6 As the trial judge's decision in this case is in compliance with this Court's prior decisions and there is a factual basis to support that decision, there is no plain error, and the judgment and sentences should be affirmed.