2010 OK CR 10

**Clarence Rozell GOODE, Jr., Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D 2008–43.**

Court of Criminal Appeals of Oklahoma.

June 9, 2010.

Stan Monroe, Larry Edwards, Tulsa, OK, Attorneys for Defendant at trial.

James H. Lockard, Deputy Division Chief, Janet Chesley, Appellant Defense Counsel, Capital Direct Appeals Division, Indigent Defense System, Norman, OK, Attorneys for Appellant on appeal.

Tim Harris, District Attorney, Steve Kunzweiler, James Hawkins, Assistant District Attorneys, Tulsa, OK, Attorneys for The State at trial.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer L. Strickland, Assistant Attorney General, Oklahoma City, OK, Attorneys for Appellee on appeal.

## OPINION

LEWIS, Judge.

¶ 1 Clarence Rozell Goode, Jr., was charged, conjointly with Ronald Dwayne Thompson and Kenneth Dominick Johnson, with three counts of first degree murder, with alternative theories of malice or felony murder, in violation of 21 O.S.Supp.2004, § 701.7(A) and (B), and one count of first degree burglary, in violation of 21 O.S.2001, § 1431, in Tulsa County District Court case number CF–2005–3904.[1] The State filed a Bill of Particulars alleging two aggravating circumstances for each of the three murder offenses: (1) the defendant knowingly created a great risk of death to more than one person; and (2) there exists a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society for each of the three murder offenses. 21 O.S.2001, § 701.12(2) and (7).

¶ 2 Goode's case was severed from his codefendants, and his trial commenced on December 3, 2007, before the Honorable Tom C. Gillert, District Judge. The jury found Goode guilty on all four counts and assessed punishment at death on each of the three first degree murder convictions, after finding that both of the aggravating circumstances existed in each murder. The jury assessed twenty (20) years imprisonment and a $10,000 fine on the first degree burglary count. Judge Gillert formally sentenced Goode in accordance with the jury verdict on January 7, 2008. Thereafter, Goode perfected his appeal to this Court.[2]

1. Kenneth Johnson was tried after Goode and was convicted on all four counts; Johnson's jury found the existence of the great risk of death to more than one person aggravating circumstance, but set punishment at life without parole on each of the three murder counts and twenty years on the first degree burglary count. Johnson's appeal was denied in Oklahoma Court of Criminal Appeals case number F–2008–291. Ronald Thompson, subsequent to both trials, entered pleas of guilty to all counts and received life without parole on one murder count, life on the two remaining murder counts and twenty years on the first degree burglary count, his *certiorari* appeal was denied on February 2, 2009 in Oklahoma Court of Criminal Appeals case number C–2008–541. Thompson had agreed to testify against Goode, and, in return, the State agreed not to file a bill of particulars against him.

2. Appellant's notice of intent to appeal was timely filed on January 16, 2008, and his Petition in Error was filed with this Court on July 1, 2008. Appellant filed his brief on February 2, 2009. The

## I. FACTS

¶ 3 Goode, Johnson, and Thompson entered the Owasso, Oklahoma home of Mitch Thompson and Tara Burchett–Thompson during the overnight hours of August 25–26, 2005. Tara's ten-year-old daughter, Kayla, happened to be staying with her mother on this particular night, sleeping on a pallet next to the Thompsons' bed.[3] All three intruders were armed with handguns. The intruders entered the bedroom and killed the victims by firing several shots into each of the victims' bodies.

¶ 4 The State's theory of motive was that Ronald "Bunny" Thompson and Goode had been in a dispute with Mitch Thompson and his friend J.R. Hoffman for a few months. Hoffman was staying with Mitch Thompson and his family. Ronald Thompson, who was Mitch's cousin, was living with Mitch's sister, Michelle Chastain. Michelle Chastain was also one of Goode's girlfriends, and Goode spend a great deal of time at her house.

¶ 5 This dispute escalated in July, 2005, when Hoffman borrowed a car from Michelle Chastain. Hoffman was to use the car to pickup some Xanax pills for Goode; however, Hoffman wrecked the car and was arrested for driving under the influence. Goode recovered the drugs from the car, but Hoffman refused to pay for the damages to the car. Toward the end of July, a month before these murders, Hoffman and Ronald Thompson got into a fight over their financial disputes. This fight ended and the parties separated for a short time.

¶ 6 Soon after, Mitch Thompson and Hoffman came back to Michelle's house armed with a baseball bat. Goode and Ronald Thompson were at the house. Mitch Thompson beat Ronald with the baseball bat. Goode showed a pistol and made everyone go outside. He turned the gun over to someone else and started a fistfight with Hoffman.

¶ 7 After this, Mitch called the Oklahoma Department of Human Services (DHS), child welfare division, and reported that Michelle, a single mother, had people living at the house who were selling drugs. DHS started a fraud investigation and as a result, they scheduled a home inspection. Mitch also called Michelle's employer and told them she was involved in drugs, and she was fired due to these reports. Evidence was introduced that Michelle threatened to kill her brother, because of his actions, but, at trial, she denied making the threats. Mitch also tried to get Goode fired from his job at Brookhaven Hospital by reporting that he was selling drugs.

¶ 8 On the evening before the murders, Goode picked up Ronald Thompson at his place of employment at about 10:00 p.m. Thompson testified that Goode arrived in a car driven by Kenneth "Fu Fu" Johnson. As they drove away, Goode told Ronald Thompson that they had business to take care of, and he handed Thompson a .22 caliber revolver and some latex gloves. Thompson said that Goode had a .357 caliber handgun and Johnson had a nine-millimeter handgun.

¶ 9 They drove to Mitch Thompson's house, got out of the car, and entered the house through the open overhead garage door. Ronald said he kicked in the door from the garage into the house, because they told him to. Ronald said he thought they were there to scare Mitch.

¶ 10 According to Ronald, he went one way in the house and Goode and Johnson went the other. Ronald heard gunshots, so he went to the room occupied by Goode and Johnson. He said Johnson put a gun to his head and told him that he needed to put in some work or he was next, meaning he needed to fire some shots or be shot. Ronald said he fired several shots into the wall of this room. They then left and dropped off the guns with another associate, Damos "Peanut" Joseph.

¶ 11 At about 4:15 a.m., Goode arrived at Michelle Chastain's house. They argued and Goode told her that he just shot her "fucking

State filed its response brief on June 11, 2009. The case was submitted to the Court June 18, 2009. Appellant's reply brief was filed July 8, 2009. Oral argument was held January 12, 2010.

3. Kayla lived with her maternal grandmother Brenda Smalygo, but was allowed to spend the night with her mother on this particular night.

brother. . . ." Goode introduced her to Johnson and said he was his cousin. She saw Ronald's Wal–Mart vest in Johnson's car, but she did not see Ronald Thompson.

¶ 12 Michelle received formal notification of her brother's death just after noon that day. Her father was also notified of the death of his son and suffered a heart attack after hearing the news. Michelle was at the hospital with her father when she first talked to detectives, but she did not volunteer any information about her knowledge of the shooting. During that day, Goode called Michelle Chastain asking if she had talked to the police and he threatened her and her family with harm, if she "made him nervous" by talking to the police.

¶ 13 Then in the early morning hours of August 27, at about 1:00 a.m., Goode and Michelle Chastain were at Denny's Restaurant. Chastain testified that Goode gave her the details of the killing by saying that Ronald Thompson kicked in the door. He said that Ronald was to go into the spare bedroom and kill Hoffman. Instead, Ronald followed Goode and Johnson into the main bedroom and started shooting the child, Kayla Burchett. Goode said he and Johnson had no choice but to shoot as well.

¶ 14 Goode told her that after the initial shots were fired, he heard some noise, so he turned the lights on. He saw Mitch on the floor next to the bed and told Mitch to look him in the face. Goode told Mitch that he should have "never snitched on me" and said "die like a bitch." Then Goode shot Mitch again. Goode told her that Johnson shot Tara Burchett–Thompson, and they would have shot Ronald Thompson, but he took off running.

¶ 15 Kayla was shot five times, once in the head, once in the back and three times in the hip. One of the hip wounds was noticeably smaller than the others, possibly coming from a .22 caliber bullet. Tara had ten gunshot wounds which could have been caused by less than ten shots, because of the paths of the bullets through different parts of the body. Mitch had been shot twice, once in the upper back and once in the face.

¶ 16 A total of seven .357 Sig[4] casings and seven nine-millimeter casings were found in the bedroom. A .22 caliber projectile was found in a cabinet drawer. This cabinet was near small holes in the wall. A search of Damos Joseph's house resulted in the recovery of two spent .22 magnum shells and a .22 magnum cartridge. These cartridges were consistent with the .22 caliber projectile found at the murder scene.

¶ 17 Goode's mother and his brother's fiancé testified that Goode was at the mother's home the evening of the murders. The fiancé, Ruby Gilyard, said Goode left for a period of time, but returned at 11:00 p.m. She could not say whether he stayed the night; however, she did see him the next morning when she woke up. Mrs. Goode testified that he spent the night, because they were traveling to visit Goode's incarcerated brother the next day.

## II. FIRST STAGE ISSUES

¶ 18 Goode begins his propositions of error by claiming, in proposition one, that the trial court erred when it allowed the State to introduce, over objection, witness Michelle Chastain's video-taped statement made to Owasso Police Detective Mike Denton. Goode objected to the introduction of this evidence at trial on the grounds that it was not admissible as a prior consistent statement; the introduction of the tape violated the confrontation clause;[5] the entire tape was not admissible based on the rule of completeness; and the tape, generally, contained irrelevant prejudicial material that should not be viewed by the jury. The trial court ruled that the entire tape would be admissible under the rule of completeness, citing *Utt v. State*, 1979 OK CR 37, 595 P.2d 448.

---

4. A .357 Sig is a pistol caliber or cartridge characterized by a bottle necked shape and made for semi-automatic pistols, not to be confused with the .357 Magnum cartridge which has a straight walled case and is typically used in revolvers.

5. Amendment VI to the United States Constitution and Article 2, § 20 of the Oklahoma Constitution.

¶ 19 Generally, we would review the trial court's decision for an abuse of discretion. *Williams v. State*, 2008 OK CR 19, ¶ 36, 188 P.3d 208, 218. But, additional facts show that deference to the trial court's ruling may be impossible. In this case, the trial court admitted that it did not review the tape. The trial court stated,

> I haven't had a chance to review it, but since the State knows that if they're wrong, this case will be reversed and is that confident that there is nothing in that statement that is prejudicial, knowing that, I'll go ahead and admit it over your objection.

¶ 20 This statement alone shows that the trial court failed to exercise its discretion, because the trial court abdicates its gatekeeping responsibility by relying on the representations of the parties.[6] Even though the trial court failed to exercise proper judicial discretion, fortunately, its decision that the tape was admissible was correct.

¶ 21 Uniquely, the tape was presented, not during the examination of Chastain, but during the defense's case-in-chief examination of Detective Denton. While Goode's attorney examined Chastain about the inconsistencies between her testimony and her statements in this taped interview, counsel did not seek to introduce the tape during Chastain's testimony.

¶ 22 Counsel's cross-examination of Chastain and her inconsistent statements on this tape centered on the location where Chastain remembered that Goode relayed details of this crime; whether it was at the Denny's restaurant, as she had testified, or whether the details were revealed by Goode at her house and on the phone, as she had told Denton in the taped interview. At trial, Chastain insisted it was at Denny's and not the latter.

¶ 23 Counsel then asked if she remembered Goode mentioning that he believed that a "bum" at the restaurant was actually an undercover police officer. Chastain did remember that conversation. Chastain admitted that Goode was very secretive, so counsel asked her why he would share all of the details at the restaurant near someone he thought was an undercover police officer? She again insisted that the details were revealed at Denny's. Counsel continued along these lines, but Chastain denied making any inconsistent statements to police.

¶ 24 During the defense case, Goode's attorney called Denton to testify. Counsel played portions of the recorded statement when Denton could not remember the contents of the conversation he had with Chastain. Denton's testimony and the recording was essentially used to impeach Chastain's testimony, which is proper pursuant to 12 O.S.2001, § 2613(B).[7] During the examination, counsel asked Denton about Chastain's statements regarding where Goode confided in her and the "homeless person" Goode believed to be an undercover police officer. The record does not reveal how much of the tape was played for the jury.

¶ 25 Afterwards, during the State's cross-examination of Denton, the State requested that the entire recordings of two Chastain interviews be introduced as evidence.[8] Defense counsel objected, stating that the tapes were not admissible as prior consistent statements. The trial court inquired whether the recordings were admissible under the rule of completeness. Defense counsel then insisted that he was using the tape to refresh the officer's memory of the interview; however, the trial court disputed that fact and noted that defense counsel played the recording for the jury and asked Denton to confirm the contents.

---

6. Moreover, and equally disturbing, is the trial court's attempt to use this Court, and the prosecution, as his scapegoat, by saying that the prosecution knows that if they are wrong about prejudicial material in the tape, the case will be reversed. Trial courts should be diligent in their effort to cure errors during trial, so that the expense of retrial can be avoided. Furthermore, defense counsel is far from blame. Instead of sitting on its hands, defense counsel should have insisted that the trial court view the tape before making a decision.

7. This Statute governs the introduction of extrinsic evidence of prior inconsistent statements.

8. Ultimately, the State only sought introduction of one tape, State's exhibit 144.

¶ 26 The trial court reserved ruling on the admissibility of the tape, because it wanted to review the rule of completeness. As a final argument, defense counsel countered that there was irrelevant prejudicial information contained on the tape, but counsel was not specific. The prosecution responded that it did not recall any historical information that might be prejudicial.

¶ 27 At the conclusion of the first stage of trial, the trial court took up the admissibility of the recording of Chastain's interviews. The trial court heard argument, ruled that the recording of Denton's interview of Chastain was admissible pursuant to *Utt* and the rule of completeness. The tape was submitted to the jury.[9]

¶ 28 In *Utt*, this Court held admission of the entire videotape containing an accomplice's prior consistent statement was proper where the defense had admitted portions of the tape as inconsistent. *Id.*, 1979 OK CR 37, ¶ 5, 595 P.2d at 450. Statutory codification of the rule of completeness cited in *Utt*, 12 O.S.Supp.2002, § 2107, provides that when a party has introduced a portion of a record, "the adverse party may require introduction at that time of any other part ... that should in fairness should be considered contemporaneously with it."

■■■ ¶ 29 Our holding in *Utt* clearly supports the admission of the tape. The reasoning in Utt applies to the present case, as well.

A party cannot offer in evidence a part of a document, conversation, or transcript of a witness' testimony for the purpose of impeaching the witness, and then complain that the court permits the remainder of such document, conversation, or transcript to be introduced to rebut the apparent impeachment. Counsel cannot be permitted, for the purpose of impeaching a witness, to introduce extracts of the former testimony of such witness, and then be heard to complain that the whole of such testimony was introduced, and the whole truth given to the jury....

*Utt*, 1979 OK CR 37, ¶ 5, 595 P.2d at 450, quoting *Huntley v. Territory*, 1898 OK 62, ¶ 12, 7 Okl. 60, 54 P. 314. Here, Goode cannot complain that the entire taped statement was given to the jury after he introduced portions favorable to his case.

¶ 30 Obviously, Goode's theory at trial was that Chastain was fabricating this whole story, because she made conflicting statements about where Goode told her the story. The tape was certainly admissible so that the jury could judge whether comparison between the story told at trial and story told during the police interview indicated that Chastain was either a credible or unbelievable witness.

¶ 31 Although admissible, certain evidence may be excluded if its relevance is substantially outweighed by certain dangers. Because trial counsel failed to adequately identify, for the trial court, material in the tape which he claims was objectionable, our review of this portion of the proposition is for plain error only. *Williams v. State*, 2008 OK CR 19, ¶ 71, 188 P.3d 208, 223. We find no plain error occurred, because the relevance of this tape was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or any other danger. *See* 12 O.S.Supp.2003, § 2403.[10] Furthermore, we find that the admission of this tape did not improperly bolster Chastain's testimony.[11]

---

9. The record does not reveal whether or not the jury viewed the tape, which is an hour-long interview of Chastain in a small interview room. Chastain's cousin is also present. Chastain is very emotional during this interview as she deals with the death of her brother at the hands of her boyfriend, and her father's heart attack which occurred a day after her brother was killed. Apparently, the tape was not loud enough to be played in the courtroom, so the only way to hear the recording was in the confines of the jury room. Even so, there is no indication that the jury played the tape.

10. This is true even if we assume that the jury had the equipment in the jury room and did in fact view the tape in its entirety.

11. The jury was instructed on the use of Chastain's prior inconsistent statements with OUJI CR 2d 9–20, the use of Goode's prior bad acts with OUJI CR 2d 9–9, and their role in judging the credibility of witnesses with OUJI CR 2d 10–8. These instructions were sufficient to inform the jury on how to apply this tape in the context of this trial.

¶ 32 Finally, we address Goode's confrontation clause argument. Goode bases this argument, that the introduction of the recording violates the confrontation clause, on his reading of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). However, language in *Crawford* supports an opposite conclusion.

> [W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. *See California v. Green*, 399 U.S. 149, 162, [90 S.Ct. 1930, 1937, 26 L.Ed.2d 489] (1970). It is therefore irrelevant that the reliability of some out-of-court statements "cannot be replicated, even if the declarant testifies to the same matters in court." *Post*, at 1377 (quoting *United States v. Inadi*, 475 U.S. 387, 395, [106 S.Ct. 1121, 1126, 89 L.Ed.2d 390] (1986)). The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it. (The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. See *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985).)

*Crawford*, 541 U.S. at 59, fn. 9, 124 S.Ct. at 1369, fn. 9 [parallel cites added]. Here, the declarant, Chastain, testified in the State's case in chief and she was extensively cross examined by defense counsel. There was no violation of the confrontation clause here.

¶ 33 Goode's next proposition relating to first stage evidence is presented in proposition two, where he attacks the State's use of witness Fred Clemons' testimony and the use of Clemons' prior inconsistent statements as evidence of guilt. At trial, Goode objected to Clemons' testimony in a pretrial motion to suppress alleging that Clemons obtained statements from Goode as an agent of the State, thus violating his 6th Amendment right to counsel. This pretrial motion was overruled. Then, just before Clemons was scheduled to testify, Goode objected to his testimony, arguing that the only reason the State was placing Clemons on the stand was to introduce prior statements to police, which they knew would be inconsistent with his testimony. He argued that their intent was to use Clemons' inconsistent statements as substantive evidence against Goode. Now, on appeal, Goode complains that Clemons' testimony was not relevant, was lacking in credibility, and was a pretext for introducing prior inconsistent statements as substantive evidence of guilt.

¶ 34 We review this claim under an abuse of discretion standard. An abuse of discretion has been defined as "any unreasonable, unconscionable and arbitrary action taken without proper consideration of the facts and law pertaining to the matter submitted." *Williams*, 2008 OK CR 19, ¶ 27, 188 P.3d at 217 (citations omitted).

¶ 35 Goode met Fred Clemons in the Tulsa County Jail, where they were incarcerated in the same "pod" for a couple of days. According to Clemons' testimony, Goode told him he was accused of the triple homicide in Owasso. Goode told Clemons that Chastain was trying to set him up, and he would like to have her killed. Clemons asked him "How much?" and Goode said "Ten thousand." Goode then asked if Clemons knew anyone that would do it. Clemons told Goode that he would get back with him.

¶ 36 Clemons further testified that Goode told him that "They said it was three people involved in the shootings." He said a little girl got killed with a .22. He told Clemons that a "clip had been unloaded" on the lady; either a nine-millimeter or a .45 caliber pistol. Clemons also testified that Goode told him that a .22, a nine-millimeter and a .357 were used in the murders.

¶ 37 After this conversation, Clemons recalled that he contacted a jailer, and later an Owasso detective interviewed him regarding his knowledge of the crime. At this point in Clemons' testimony his memory became fuzzy about what Goode told him and what he told police.

¶ 38 Clemons did recount that he told the police that Goode said that he had the .357 caliber handgun. He testified that he told police that Thompson had the .22 and Goode's cousin had the nine. However at trial, Clemons recanted and said that Goode never actually told him these facts and testi-

fied that Goode told him he was not at the shootings.

¶ 39 Clemons testified that Goode believed that the murder occurred because Mitch caused DHS to take Chastain's baby away from her and because Mitch had beaten Thompson until Thompson became unconscious. According to Clemons, Goode said Thompson shot the child with the .22.

¶ 40 On cross examination, Clemons again testified that Goode told him he was with his mother and was not present when the shooting took place. He said that Goode never admitted to any involvement in the murders. He testified that he was willing to tell police anything so he could get relief on his cases in Texas. He also testified that he had testified in a previous case in 1995 and was able to have charges against him dismissed. Clemons admitted that he was making assumptions when he talked to the police and he basically lied to the police, but he was telling the truth at trial.

¶ 41 On redirect Clemons testified that Goode told him details about the murders of which he was unaware, such as, there were three guns used: a .22, a nine-millimeter, and a .357. He claimed that he told police that Goode said he was not present when the murders occurred, but he could not find in the transcript of the interviews where that occurred.

¶ 42 Obviously, Goode had information about this case and was willing to share this information with Clemons. A review of Clemons' testimony reveals that his testimony was relevant on this account. Even Goode admits that evidence that a defendant has relayed details of a crime, which only the perpetrator could have known, is relevant. *See Dodd v. State*, 2004 OK CR 31, ¶ 29, 100 P.3d 1017, 1030 (holding defendant's proprietary knowledge regarding details of a crime provided probable cause for arrest). Evidence showing a defendant's knowledge of the details of a crime, which have not been released to the public, is relevant to show

participation in the crime. See 12 O.S.2001, § 2401 (defining relevant evidence). Goode complains, however, that the way Clemons was questioned made it seem as if Goode had confessed to the crime.

¶ 43 We read the testimony differently. Clemons repeatedly testified that Goode told him that he was not involved in the murders, his girlfriend was trying to set him up for the murders, and Goode never told him that he was at the crime scene. Furthermore, the jury's use of Clemons' prior statements, inconsistent with this testimony, was properly channeled by an instruction which told them that they could only use Clemons' prior inconsistent statements as impeachment and not as substantive proof of guilt. In conclusion, we find that the trial court did not abuse its discretion in permitting this testimony.

¶ 44 Goode next attacks, in proposition three, the admission of certain evidence which, he claims, was irrelevant or for which the relevance was substantially outweighed by the dangers outlined in 12 O.S.2001, § 2403. The admission of evidence is left to the sound discretion of the trial court, which we will not disturb absent an abuse of that discretion. Where no objection was raised, we review for plain error only.

¶ 45 He first complains about the admission of an audio tape of the 911 call made by Brenda Smalygo upon discovering the bodies of her daughter and granddaughter at the crime scene.[12] Defense counsel objected to the introduction of this tape on relevance and prejudice grounds. After the playing of the tape, counsel asked for a mistrial, because of the prejudicial nature of the tape and Smalygo's emotional response to the tape. The motion for mistrial was denied.

¶ 46 Now, on appeal, Goode claims that the tape was irrelevant, and, even if minimally relevant, its relevance was substantially outweighed by the danger of unfair prejudice.[13]

---

12. State's Exhibit 18.

13. In the past, this Court has held that some 911 tape recordings are not excluded by the hearsay rule. 12 O.S.2001, § 2803; *Stouffer v. State*,

2006 OK CR 46, ¶¶ 114–17, 147 P.3d 245, 269; *Al–Mosawi v. State*, 1996 OK CR 59, ¶ 56, 929 P.2d 270, 283–284. However, hearsay is not the issue here.

The State, in opposition, cites *Williams v. State*, 2008 OK CR 19, 188 P.3d 208, as support for the admission of 911 tapes. In *Williams*, however, there was no objection to the introduction of the tapes and the tapes were recordings of victims and witnesses who observed or heard evidence of a crime, just after its occurrence. We held that, while the tapes may have been cumulative to the witnesses' testimony, the cumulative nature did not substantially outweigh the relevance, thus there was no plain error. *Williams*, 2008 OK CR 19, ¶ 73, 188 P.3d at 223–24. The State argues that, if any error occurred in the admission of the tapes, the error was harmless.

¶ 47 Unlike *Williams*, we have a contemporaneous objection in the present case; therefore, we review for an abuse of discretion. The 911 tape presented here contains the conversation between an extremely emotional Smalygo and the emergency services dispatcher. In the conversation, Smalygo tells the dispatcher that her "baby" is dead and ice cold. The dispatcher believes that the victim is a baby and tries to get Smalygo to bring the "baby" to the phone. Finally, the dispatcher understands that the "baby" is ten years old and advises Smalygo to attempt to do CPR on the victim.

¶ 48 We find no relevance to the conversation in this tape other than Smalygo's statement that her granddaughter is dead. This fact was undisputed and was clearly established by other evidence in this case. While the time of death might have been an issue, this conversation did nothing to establish a time of death. Because there was no relevance in this 911 tape, we find that the trial court abused its discretion in allowing the introduction of this tape.

■ ¶ 49 Although we find error, Goode must also show that the introduction of the tape was prejudicial.[14] The introduction of irrelevant evidence does not always require relief, as was the case in *Walker v. State*, 1994 OK CR 66, ¶¶ 27–28, 887 P.2d 301, 311.

In *Walker*, this Court held that a 911 tape of a victim calling and saying "he's killing me" and "I'm dead" was irrelevant and prejudicial because it did not name the defendant nor did it prove malice aforethought. Due to overwhelming evidence of guilt in *Walker*, the introduction was held harmless. *Id.*

¶ 50 Likewise, in this case, the jury had already heard from Smalygo whose emotional testimony described how she found the body of her dead granddaughter, Kayla, and how she attempted to revive her granddaughter by following the directions of the 911 operator. They learned that Kayla was living with Smalygo, but was at her mother's house that night, because she begged Smalygo to allow her to spend the night there. Although the tape contained a highly emotional Smalygo talking to a 911 operator, we cannot conclude that the contents of the tape prejudiced Goode in any material way. Therefore, the introduction of this tape was harmless.

■ ¶ 51 Goode next complains about the prosecution's references to the movie *Scarface* and implications that Goode was emulating the gangster portrayed by Al Pacino in that movie. The prosecution first alluded to this movie in opening statement, without objection, then during the direct testimony of Michelle Chastain, the prosecution attempted to elicited testimony referencing *Scarface*, but he could not ask a question without leading, so the trial court sustained the defense's objections. During re-direct, Chastain testified that Goode told her that he was like *Scarface* when he killed Mitch Thompson, because he wanted Mitch to look him in the eye. There was no objection to this testimony. Evidence was also introduced that Goode had a notebook in his car with a picture of *Scarface* taped to the front,[15] and he was wearing a *Scarface* t-shirt when he was first questioned by police. Counsel objected to testimony about the *Scarface* t-shirt

---

14. *Smallwood v. State*, 1995 OK CR 60, ¶ 29, 907 P.2d 217, 227 ("This Court has consistently held that it is not error alone that reverses the lower court's judgments, but error plus injury, and the burden is upon the appellant to establish the fact that he was prejudiced in his substantial rights by the commission of the alleged error.")

15. State's exhibit 131, which is actually a photograph of the notebook, was introduced.

and the introduction of the notebook on relevance grounds.

¶ 52 Then during closing argument, the prosecution made several comments stating that Goode was trying to be the modern day *Scarface*. There was no objection to the closing argument.

¶ 53 The theory of the State's case was that Goode envisioned himself as a modern day *Scarface,* who took care of his own business with force. The statements by Goode to Chastain and his possession of *Scarface* fan paraphernalia provided a basis for this theory. We find that this evidence was relevant to show Goode's motive for these crimes.

¶ 54 Next, Goode complains about evidence of firearms which were not relevant, because they were not connected to this case. The handguns were found contemporaneously with the arrest of co-defendant Johnson who was arrested outside the home of Tammy Hamilton. A nine-millimeter handgun was found on the seat next to him when he was arrested and a .357 caliber revolver was found in a car owned by Ms. Hamilton, which was parked outside the home. Evidence about the .357 revolver was first elicited by defense counsel and the prosecution only mentioned it later to show that it was not used in this crime; therefore, Goode cannot complain about the reference to this pistol.

¶ 55 Regarding the nine-millimeter pistol found next to Johnson; although a nine-millimeter pistol was used in these homicides, this pistol could not positively be matched to the evidence found at the scene. The prosecution's theory in this case was that Johnson used a nine-millimeter handgun during the crime. The nine-millimeter casings found at the scene showed similarities with casings which were test fired from the nine-millimeter pistol found with Johnson in the car. However, the State told the jury that it did not believe that this gun was used in the crime. The relevance of this gun was to establish that Johnson's caliber of choice was the nine-millimeter. This gun did have some relevance, although slight, and served

to corroborate Thompson's testimony that Johnson used a nine-millimeter during the murder. We find no reversible error in the introduction of this evidence.

¶ 56 Goode's next claim of evidentiary error, raised in proposition four, is that the trial court abused its discretion when it allowed introduction of a photograph of the child victim, taken while she was alive, over defense counsel's objection on relevance grounds. Oklahoma State law allows the introduction of this type of photograph. 12 O.S.Supp.2003, § 2403. This section provides that,

> [I]n a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim while alive.

In this case the State offered exhibit 17, which was a portrait of Kayla Burchett, the ten-year-old and youngest of the three victims in this case. Along with the statutory authority indicating relevance, a photograph of a victim taken prior to being killed is relevant to proving the defendant killed a live human being and relevant to proving the identity of the victim, whether or not disputed at trial, because the State always has the burden of proving every element of the offense. *Glossip v. State,* 2007 OK CR 12, ¶¶ 78–79, 157 P.3d 143, 156–57; *Coddington v. State,* 2006 OK CR 34, ¶¶ 53–57, 142 P.3d 437, 452–53.[16]

¶ 57 Although relevant, like all evidence, the "in life" photograph may be excluded if its relevance is substantially outweighed by the dangers outlined in 12 O.S.2001, § 2403. The trial court was very careful in the use of this photograph. The trial court did not allow the parties to use the photograph in closing argument, nor did he allow the photograph to be taken with the jury during deliberations. The record reflects that the jury only had a brief view of this photograph at the time it was initially admitted. We find that the trial court did not abuse its discre-

tion when it admitted this photograph, thus there is no error here.

## III. SECOND STAGE ISSUES

 ¶ 58 Goode argues, in proposition seven, that victim impact evidence was improperly admitted during the second stage of trial. Prior to trial, Goode requested that no victim impact evidence be admitted; however, this request was denied. During trial, Goode objected to the statement of Tessa Amaro, because she was not a person authorized by Oklahoma Statutes to give a "victim impact statement" about the impact of the death of her niece, Kayla Burchett. The trial court ruled that Amaro could testify, as a family designee, about the impact of Kayla Burchett's death, as Kayla's only immediate family members were killed alongside her.

¶ 59 The State sponsored three victim impact witnesses, including Amaro, each of these witnesses read a prepared statement at trial. The other witnesses were Jim Burchett, father of victim Tara Burchett and grandfather of victim Kayla Burchett, and Gwen Davidson, the sister of victim Mitch Thompson. The trial court indicated that Amaro was the designee for victim Kayla Burchett. Amaro was the only person who gave a statement regarding the impact of the death of child-victim Kayla Burchett.

¶ 60 Now, on appeal, Goode argues that Amaro was not a proper sponsor of victim impact evidence and her testimony did not qualify as victim impact evidence. Goode argues that Amaro, as Kayla Burchett's aunt, could not give a statement about the impact of the death of Kayla on her.

¶ 61 This Court has addressed victim impact issues in the past holding that both "victim impact statements" and "victim impact evidence" are admissible in a capital sentencing procedure. This includes a rendition of the "circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence." See 22 O.S.2001,

§ 984; *Dodd,* 2004 OK CR 31, ¶ 95, 100 P.3d at 1044. Section 984 reads in part:

"Victim impact statements" means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence;

¶ 62 "Members of the immediate family" means the spouse, a child by birth or adoption, a stepchild, a parent, or a sibling of each victim. 22 O.S.2001, § 984(2). Even though admissible, evidence may be introduced that "is so unduly prejudicial that it renders the trial fundamentally unfair," thus implicating the Due Process Clause of the Fourteenth Amendment. *Lott v. State,* 2004 OK CR 27, ¶ 109, 98 P.3d 318, 346, *quoting Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991).

¶ 63 In *Lott,* two members of the immediate family testified—the victim's son and daughter. Another witness, similar to the case at bar, also testified—the victim's granddaughter who was a "representative." The granddaughter testified about the impact of the death on the entire family, her father and her aunts and uncles. In *Williams,* 2008 OK CR 19, ¶ 100, 188 P.3d at 227, this Court held that a family member can give victim impact testimony on behalf of several immediate family members, as long as that testimony is otherwise admissible.

¶ 64 Here, while Amaro testified as a representative, which is proper under our case law, she also testified about the effect of Kayla's death on her and her own daughter.[17] She described the relationship between Kayla and her own daughter as like sisters; however, neither she nor her daughter, meet the definition of "immediate family member." While some of her testimony concerned the effects on persons who were not immediate family members, other portions of her testi-

---

**17.** Her testimony also included proper testimony about the impact of death of Tara Burchett, her sister, on her.

mony were relevant to show how the immediate family members' interaction with others was impacted by the death. The remainder of the testimony gave a brief glimpse into the life of Kayla Thompson and the circumstances surrounding the crime, which was admissible.

¶ 65 The unusual family dynamic represented in this case presents a situation that is not contemplated by the victim impact statutes. Kayla was being raised primarily by her grandparents who were also Amaro's parents. Kayla's only "immediate family members," her mother and father, were also killed in this crime. While one could possibly conclude that the closeness of Kayla to Amaro was much like that of sisters, Amaro testified that Kayla and her daughter were like sisters, not that she and Kayla were like sisters. Because this type of relationship is not one which is defined as an "immediate family member," we find that testimony regarding the impact of Kayla's death on Amaro and her daughter was not proper.

¶ 66 Although we find that much of Amaro's testimony describing the impact of the death on her and her daughter was not admissible, we cannot find that this testimony prejudiced Goode in any way. Kayla was only one of three victims in this case. Amaro's testimony consisted of a prepared statement taking up two pages of transcript. Her testimony, generally, was about the effect of Kayla's death on the immediate family and the family dynamic, which was admissible. The small portion which was not admissible, in light of the remaining permissible victim impact evidence, did not contribute to the sentence in this case. *See Lott,* 2004 OK CR 27, ¶ 114, 98 P.3d at 348.

¶ 67 Also in this proposition, Goode claims that victim impact evidence, in general, violates the Eighth Amendment and has no place in Oklahoma's capital sentencing scheme. He argues that victim impact acts

as an unauthorized "superaggravator." We have consistently rejected this argument, and we find no reason to revisit the issue here. *Jackson v. State,* 2007 OK CR 24, ¶ 26, 163 P.3d 596, 603–04 (and cases cited therein).

¶ 68 Goode's next sentencing stage argument, found in proposition eight, is that the instructions defining mitigating evidence were insufficient. He argues that the trial court's instruction which defines mitigating evidence as factors which "in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame" impermissibly narrows the characterization of mitigation.[18] OUJI–CR 2d 4–78 (1996). This same argument was recently rejected in *Rojem v. State,* 2009 OK CR 15, ¶ 26, 207 P.3d 385, 396, even in light of our decision to have the instruction modified in *Harris v. State,* 2007 OK CR 28, ¶ 27, 164 P.3d 1103, 1114. We find that the jury in this case was not limited in their ability to consider mitigating evidence.

¶ 69 Goode next argues, in proposition six, that Oklahoma's "continuing threat" aggravating circumstance is unconstitutional.[19] Goode recognizes that we have consistently rejected this claim, but urges reevaluation of this aggravating circumstance, because it has been some time since a substantive analysis of this aggravating circumstance has been undertaken by this Court. Goode argues that this Court's past reliance on *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), in which the United States Supreme Court found a continuing threat aggravating circumstance in Texas's death penalty scheme constitutional, is misguided because Oklahoma's death penalty procedure is much different from the Texas procedure. Goode also argues that evolving standards of decency have rendered this aggravating circumstance, as it is applied under the Oklahoma procedure, violative of the Eighth Amendment to the United States Constitution.[20]

18. This instruction was modified by the OUJI committee after the trial of this case.

19. "The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." 21 O.S.2001, § 701.12(7).

20. His argument is based, in part, on the fact that only six of the thirty-eight states which authorize the death penalty use a future dangerous aggravating circumstance as a special consideration for punishment and only two of those states, Oklahoma and Wyoming, authorize a continuing threat aggravating circumstance to be a

¶ 70 Goode's argument that *Jurek* does not apply was rejected in *Murphy v. State*, 2002 OK CR 24, ¶¶ 38–39, 47 P.3d 876, 884. Furthermore, the Tenth Circuit has upheld this State's continuing threat aggravating circumstance under similar arguments. *See Castro v. Ward*, 138 F.3d 810, 816–17 (10th Cir. 1998); and *Nguyen v. Reynolds*, 131 F.3d 1340, 1353–54 (10th Cir.1997). We find no reason to revisit the issue in this case, and we continue reject this argument.

¶ 71 With respect to Goode's argument that evolving standards of decency and the highly speculative nature of predicting the probability of future conduct makes this aggravating circumstance suspect, we find that the instructions on the continuing threat aggravating circumstance are sufficient to make the aggravating circumstance valid. The instructions require a finding that a defendant's behavior has demonstrated a threat to society and a finding that there is a probability that this threat will continue to exist in the future. OUJI–CR 2d 4–74 (2006). This aggravating circumstance may be proven by evidence of prior convictions, unadjudicated offenses, the nature of the crime itself, or any other relevant evidence. *Sanchez v. State*, 2009 OK CR 31, ¶ 81–94, 223 P.3d 980, 1006–11; *Magnan v. State*, 2009 OK CR 16, ¶ 31, 207 P.3d 397, 407.

¶ 72 This Court has consistently held that this aggravating circumstance sufficiently narrows the class of murders that are eligible for the death penalty so as to pass constitutional muster. *Magnan*, 2009 OK CR 16, ¶ 37, 207 P.3d at 408. There is no reason to reevaluate this aggravating circumstance at this time.

## IV. PROSECUTORIAL MISCONDUCT

¶ 73 In proposition five, Goode claims that the prosecutor committed misconduct during several phases of the trial, especially during closing argument. Goode admits that there were no objections to the statements that he now alleges as misconduct, thus this Court is limited to a review for plain error only. *Andrew v. State*, 2007 OK CR 23, ¶ 128, 164 P.3d 176, 202.

¶ 74 His first claim centers on the references to the movie *Scarface* and Goode's proclivities toward that movie. As discussed in proposition three, Goode likened himself to *"Scarface"* (the lead character in the movie with the same name), and he was obviously enamored with the movie. The prosecutor here was simply arguing the evidence from the State's point of view. The right of argument contemplates a liberal freedom of speech, and that the range of discussion, illustration, and argumentation is wide. *Marshall v. State*, 1998 OK CR 30, ¶ 20, 963 P.2d 1, 8.

> Counsel are entitled to liberal freedom of speech in arguing competing inferences of the case from their opposing points of view. *Frederick v. State*, 2001 OK CR 34, ¶ 150, 37 P.3d 908, 946. Reversal is required only where grossly improper and unwarranted argument affects a defendant's rights. *Howell v. State*, 2006 OK CR 28, ¶ 11, 138 P.3d 549, 556.

*Ball v. State*, 2007 OK CR 42, ¶ 57, 173 P.3d 81, 95.

¶ 75 Here, the prosecutor was merely exercising his right of argument based on the evidence presented; there was no misconduct in this argument.

¶ 76 Goode next complains that the prosecutor improperly vouched for "jailhouse snitch" Fred Clemons. The prosecutor did not vouch for Clemons. He was merely pointing out that Clemons testified to information which only the killer would know. This argument did not amount to plain error.

¶ 77 Lastly, Goode argues that the prosecutor told the jury that the defense must provide evidence to corroborate its witnesses. The prosecutor argued that testimony from defense witness Penny Avans lacked corroboration. He also argued that the testimony of State's witnesses Michelle Chastain and Ronald Thompson were fully corroborated.

¶ 78 While some of the State's witnesses' testimony required corroboration in this case—such as accomplice testimony—the

determining factor for death eligibility. The remainder use continuing threat/future dangerousness as a factor after the jury has already determined a person is eligible for the death penalty.

same is not true of defense witnesses. Here, though inartfully, the prosecutor was merely asking the jury to weigh the evidence in light of the entire record, as the instructions so indicate. There is no plain error here.

¶ 79 To overcome the plain error review, he claims, in proposition nine, that defense counsel was ineffective for failing to object to this argument. We find that counsel's failure to object did not prejudice Goode in any way, thus there is no ineffective assistance.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 80 In addition to the failure to object to the closing argument, Goode also argues in proposition nine, that counsel's conduct fell below reasonable objective standards. He points to counsel's additional failure to object to certain hearsay evidence and certain opinion evidence introduced at trial. He also claims that counsel was ineffective for failing to investigate and utilize available evidence.[21]

¶ 81 In order to show that counsel was ineffective, Appellant must show both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In *Strickland*, the Court went on to say that there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional conduct, i.e., an appellant must overcome the presumption that, under the circumstances, counsel's conduct constituted sound trial strategy. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

¶ 82 To establish prejudice, Appellant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

¶ 83 Goode complains that counsel failed to object to hearsay testimony of Cherry Thompson and to the expert opinion testi-

mony of Detective Felton. The alleged hearsay testimony by Cherry Thompson, Mitch and Michelle's mother, concerns statements made to her by Felton. On redirect, Thompson was asked if she learned that Xanax pills from the Dodge Neon was, one of many things, a motive in this case. She testified that she learned this from J.R. Felton. These questions were in response to defense counsel's inquiry about Xanax pills in connection to the earlier fight at Michelle's house and whether she had disclosed this information to the authorities. The prosecution's inquiry was an effort to rehabilitate her credibility; counsel's failure to object did not fall below reasonable standards because the questioning showed that she did not have first hand knowledge.

¶ 84 The expert opinion referenced in this argument is Felton's opinion that Chastain was talking to a black male the day after the murders. Felton was present at Hillcrest hospital when Chastain received a phone call. (Chastain had testified that Goode kept calling her that day and threatening her and her family if she talked to the police.) According to Felton, Chastain became visibly upset when she received this call. Felton could hear the other voice on the phone and he described the voice as a deep male voice speaking in street slang. Felton was asked if he could identify the race of the individual and counsel objected that a proper foundation had not been laid. After describing his professional experience, Felton testified that the voice was consistent with a black male's voice. Counsel did not object to the opinion; therefore, Appellant now claims that he was ineffective for failing to object to this opinion testimony.

¶ 85 Felton was merely saying that the voice sounded like a black male. There is no expert opinion in this testimony, merely a lay opinion. The failure to object did not change the outcome of this case, in this instance, thus there is no ineffective assistance in the failure to object.

---

21. Goode has filed a motion for evidentiary hearing pursuant to Rule 3.11 to support his claims on appeal.

¶ 86 Goode lastly claims that counsel failed to investigate and utilize additional evidence during the first stage to impeach Ronald Thompson; and failed to investigate and utilize available mitigation evidence during the second stage. Goode has filed an Application For Evidentiary Hearing on Sixth Amendment Claims pursuant to Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2010). Affidavits attached thereto are offered to meet the burden set forth in the above rule that "the application and affidavits must contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective." *Id.*

¶ 87 The affidavits are provided to support the claim that additional evidence was available to impeach Ronald Thompson. The first is an affidavit from Douglas Miller, a cellmate of Thompson. Miller states that he "confronted" Thompson and told him that he was friends with Tara Burchett–Thompson, knew Mitch, and attended Tara and Kayla's funeral. Ronald Thompson got mad and they exchanged words. Miller told Thompson he just wanted the truth. Miller's affidavit states that Thompson said he could not remember what happened because he was "fucked up on zanex [sic] and extacy." He said that the police brought up the names of Goode and Johnson and since he was picked up by Goode that evening, he believed the story would work out. Thompson told Miller that Mitch owed him money and beat him with a baseball bat. Miller states that he did not reveal this information before because he wanted to stay out of the middle of things.

¶ 88 The next piece of evidence is information that Damos Joseph provided to police before trial disputing the fact that the killers took the weapons to him after the murders. The information in the motion for an evidentiary hearing indicates that trial counsel had this information, and the record indicates that counsel did not use this information to cross-examine Thompson during trial. The

record also indicates that Joseph did not testify at trial.

¶ 89 Goode has provided no affidavits from Joseph indicating that he was available to counsel nor are there affidavits from trial counsel indicating his knowledge of this information or his trial strategy regarding this information.

¶ 90 Obviously the information from Miller is suspect. Thompson was cross-examined extensively about his drug use during and after these crimes. He admitted that he was intoxicated. He also admitted that he lied to police about his involvement in the crime, and then his story evolved during the interview to the level somewhat consistent with his testimony.[22] His statements to Miller were an effort to conceal his involvement in this crime, because Miller was friends with the victims. Thompson surely feared retaliation from Miller if Thompson told Miller what actually happened.

¶ 91 The information from Joseph is equally suspect. Joseph is obviously trying to deny any involvement in this crime and trying to deny that he was an accessory after the fact by denying that he took the guns after the crime.

¶ 92 None of this information provides "clear and convincing evidence" that shows "a strong possibility trial counsel was ineffective." In other words the information does not adequately show that counsel's conduct fell below reasonable standards of conduct, or that the failure to utilize this evidence prejudiced Goode. *See Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Simpson v. State,* 2010 OK CR 6, ¶ 53, 230 P.3d 888, (holding that this clear and convincing standard is less onerous than the standard set forth in *Strickland.*)

¶ 93 The second part of this claim is that counsel was ineffective for failing to investigate and utilize additional mitigation witnesses. Goode provides, in the application for evidentiary hearing, several affidavits from family members, including Goode's daughter and son, friends, and coworkers.

---

**22.** Thompson first told police that he did not go into the house, and then he told them that he did go in the house, but he did not have a gun, then later he told them that he had a gun but he did not shoot it. Then he finally admitted to firing the gun, but only because of the threats.

Goode claims that because his attorney never contacted many of these witnesses, he could have no way to make a strategic decision regarding the use of these witnesses. *See Wiggins v. Smith*, 539 U.S. 510, 527, 123 S.Ct. 2527, 2538, 156 L.Ed.2d 471 (2003).

> Claims of ineffective assistance for failure to adequately investigate and present mitigating evidence are treated in essentially the same manner as other ineffective assistance claims, requiring a showing of both deficient attorney performance and prejudice. The main difference is in the prejudice analysis, where the reviewing court must determine whether there is a "reasonable probability" that if trial counsel had presented the omitted mitigating evidence, the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." In making this determination, the newly proffered mitigating evidence must be considered along with the mitigating evidence that was presented and then weighed against the aggravating evidence that was presented. Finally, we also consider whether there is a reasonable probability that inclusion of the omitted mitigating evidence could have "alter [ed] the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case."

*Malone v. State*, 2007 OK CR 34, ¶ 112, 168 P.3d 185, 229 [footnotes and citations omitted]

¶ 94 Counsel called two witnesses in the second stage, Goode's mother, Margaret Goode, and his fiancé, Larenda Carter. This testimony, along with the first stage testimony of coworker Teresa Sharpe, formed the basis of Goode's mitigation evidence, which was outlined in an instruction to the jury.[23]

¶ 95 In this case, Goode cannot show that he was prejudiced by the absence of additional mitigating evidence. Most of the information provided in the affidavits was presented to the jury. Goode's mother and fiancé testified about his good family background, his childhood, his participation in high school sports, and his devotion to his family and children. Goode's coworker testified about his employment and his ability to assist patients in the mental health ward at the hospital.

¶ 96 One affidavit describes Goode as coming from a good home, but upon reaching his teen years he began getting into trouble because he was influenced by peers. Affidavits from Goode's children describe their life with Goode in a very positive light. Coworkers' affidavits also describe him as a good worker. Other friends describe Goode as a good person while around them. Much of Goode's proposed additional mitigation evidence was cumulative to that presented to the jury. Even if trial counsel had presented all of the mitigating witnesses now proposed, there is no reasonable probability that the outcome of the trial would have been different. Goode has, therefore, failed to show by clear and convincing evidence there is a strong possibility that counsel was ineffective, and he has failed to establish the need for an evidentiary hearing, thus the application for an evidentiary hearing is denied, and Goode's claims of ineffective assistance are also denied.

## VI. CUMULATIVE ERROR AND MANDATORY SENTENCE REVIEW

¶ 97 After reviewing this entire case, we find no individual error which requires reversal. Even when we view these alleged errors in a cumulative fashion, we find that no relief is required, thus Goode's cumulative error claim must fail. *Woods v. State*, 1984 OK CR 24, ¶ 10, 674 P.2d 1150, 1154.

---

**23.** The evidence was that Goode had a secure and healthy attachment with both parents; Goode lived in the same home from birth to age 18; Goode had only one sibling; Goode's parents presented good role models, strong work ethic and strong family ties; Goode attended church; Goode has four children who love him and continue to be in contact with him; Goode's mother and family continue to support him; Goode took a leading role in helping his family after the death of his father; Goode was a responsible father to his daughter and wants to continue a positive relationship with his children; Goode was very caring and helpful with seniors where he worked; Goode was gainfully employed for 5-1/2 years before his arrest; Good was 29 years old at the time of these homicides.

¶ 98 We find that there is sufficient evidence for the aggravating circumstances found by the jury: (1) the defendant created a great risk of death to more than one person; and (2) there exists a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society.

¶ 99 Here, great risk of death is clear. The evidence is clear that three people were shot and killed in the same room, thus satisfying the elements of this aggravating circumstance. *See Dodd,* 2004 OK CR 31, ¶ 106, 100 P.3d at 1048. Evidence of continuing threat was proven by the callous nature of this crime, Goode's threats to harm Michelle Chastain and her family after the murder, his attempt to hire someone to kill Chastain, and his prior conviction for possession of a firearm, after former conviction of a felony, in the United States District Court for the Northern District of Oklahoma.[24] *See Harris v. State,* 2007 OK CR 28, ¶ 14, 164 P.3d 1103, 1110.

¶ 100 Goode presented mitigating evidence, which was summarized and listed in an instruction to the jury. In addition, the trial court instructed, that the jury could decide that other mitigating circumstances exist and they could consider them as well. Obviously the jury chose to find that, even with the mitigating evidence, Goode should be sentenced to death. We agree.

¶ 101 We can say, beyond a reasonable doubt, that the jury's verdict was not born under the influence of passion, prejudice or any other arbitrary factor, and the evidence supported the jury's findings of the aggravating circumstances. *See* 21 O.S.2001, § 701.13.

¶ 102 We find no error warranting reversal of Goode's convictions or sentences; therefore, the Judgments and Sentences of the trial court are, hereby, **AFFIRMED.** Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2010), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, P.J., and A. JOHNSON, V.P.J., concur.

LUMPKIN, J., concurs in results.

LUMPKIN, Judge, concurs in result.

¶ 1 I concur in the Court's decision to affirm the judgments and sentences in this case. However, I have some disagreement in how the Court arrives at those decisions.

¶ 2 I disagree with the Court's decision as to the admissibility of the 911 tape. The Court says it finds no relevance to the tape. However, what can be more relevant than the reporting of the crimes in question and the events surrounding it? Regretfully, the Court engages in an after the fact analysis of whether the State needed the evidence in determining whether it was relevant or not. It is hard to know what the jury thought was necessary in their decision making, but it is undeniable they would have at least wanted to know how the crime was discovered and the actions that were taken in reporting it. This 911 tape falls directly within the scope of admissibility approved by the U.S. Supreme Court in *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). It would appear this action is just another attempt to sanitize the horrific nature of this crime for the defendant's benefit. Because I believe it was admissible in the first place, it was not necessary to perform a harmless error analysis.

¶ 3 While I concurred in *Walker v. State,* 1994 OK CR 66, 887 P.2d 301, I have since that time become concerned regarding the Court's proclivity for after the fact determination of what was necessary for the proof in cases at trial. *See Lowery v. State,* 2008 OK CR 26, 192 P.3d 1264, 1273–1275 (Lumpkin, J.: Concur in Part/Dissent in Part). What may seem unnecessary to meet burden of proof requirements after the fact of a conviction by a jury may have been extremely important in the jury's decision making process. The Oklahoma Evidence Code provides " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evi-

---

24. State's exhibit No. 145.

dence'." 12 O.S.2001, § 2401. I would submit that a 911 tape that qualifies for admission pursuant to *Davis v. Washington, supra,* is admissible as relevant evidence for the jury to consider in their deliberations.

¶ 4 I also disagree with the Court's analysis of the victim impact evidence presented by Tessa Amaro. While the Court spends much time discussing the "immediate family" provision of 22 O.S.2001, § 984(2), it fails to recognize the "or" in the statute that allows "or person designated by the victim or by family members of the victim" to testify to the impact as set out in Section 984(1). While the opinion recognizes Amaro testified as a representative and that the testimony was proper, the opinion makes the mistake of thinking the testimony is restricted to impact on the immediate family when Section 984(1) says the impact can be on immediate family "or person designated by the victim or by family members of the victim". Section 984(1) defines victim impact statements and Section 984.1 states who may present victim impact statements. The opinion apparently has confused the two and failed to recognize that section 984(1) allows for the victim impact statement to include the impact on a "person designated by the victim or family members of the victim" and that is what was done here. Therefore, I find the testimony of Tessa Amaro to be allowed by 22 O.S.2001, § 984 and § 984.1.